**Keith STUBL, Plaintiff,**

v.

**T.A. SYSTEMS, INC., a Michigan Corporation, Ken Frey, and Ken Batur, Jointly and Severally, Defendants.**

No. 96–75687.

United States District Court,
E.D. Michigan,
Southern Division.

Nov. 12, 1997.

George W. Burnard, Troy, MI, for Plaintiff.

Kenneth A. Flaska, Detroit, MI, for Defendants.

## OPINION AND ORDER REGARDING CROSS–MOTIONS FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I.  INTRODUCTION

This matter is before the Court on cross-motions for summary judgment arising out of Plaintiff Keith Stubl's Complaint alleging that Defendants violated his rights under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, et seq. (hereinafter "the Act" or "FMLA"). In Count I of his Complaint, Plaintiff names as Defendants T.A. Systems, Inc., as well as Ken Batur and Ken Frey, President and Vice President of the company respectively.  Plaintiff alleges Defendants violated the Act when, upon his return from leave, they deducted money from his paycheck for medical insurance premiums Defendant T.A. Systems, Inc. ("T.A.") paid during his leave and terminated Stubl for exercising his right to take a leave of absence under the Act. In Count II of the Complaint, Plaintiff alleges T.A. breached his employment contract when they refused to pay commissions on certain pre-termination and post-termination orders. In Count III, Plaintiff seeks damages under M.C.L. 600.2961 for allegedly overdue commissions.

Presently before the Court is Defendant's Motion for Summary Judgment, brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.  In this Motion, Defendants argue that Plaintiff did not give adequate notice to T.A., or provide the medical evidence required by T.A.'s employee manual, to be covered under the Family and Medical Leave Act. Defendants also claim that Plaintiff has produced no evidence to show that the reasons given for his termination were pretextual.  With respect to Counts II and III, Defendants argue they have paid Mr. Stubl the commissions he is entitled to.

Also before the Court is Plaintiff's Motion for Partial Summary Judgment for the first claim in Count I, in which Plaintiff argues Defendants violated the Act by charging him for his medical insurance upon his return, in violation of the FMLA.

### II.  FACTUAL BACKGROUND

Plaintiff Keith Stubl worked for T.A. as an in-house salesman from 1991 through late July 1996.  T.A. is a custom machine shop with approximately 85 employees.

In June 1995, Mr. Stubl's 15 year-old son Keith Jr. committed suicide.  Stubl took a week off from work for the funeral, but continued working thereafter.  On July 5, 1995, Stubl sent a letter to Ken Frey and Ken Batur stating he was taking some time off work to get through problems he was encountering as a result of his son's death.[1] The letter read as follows:

**July 5, 1995**

To:  **Ken Batur**

    **Ken Frey**

    **Irene LeFevre**

From:  **Keith A. Stubl**

RE:  **Personal Leave of Absence**

**Based on the personal tragedy I have recently encountered I have thought things through and believe I necessitate some personal time off work.  I have attempted to work on a day to day basis for T.A. Systems, but my loss is taking it's toll on me.**

---

1.  T.A. claims Stubl was having other problems as well as the death of his son.  (Defendants, Brief in Support of Motion for Summary Judgment, p. 4).  These claims include going through a divorce, being criminally charged with physically assaulting his wife, and having an extra-marital relationship with T.A. employee Irene LeFevre.

Please see below some things that I believe should be understood between both parties regarding my leave of absence:

1.)It is understood that I am taking this leave of absence based on my personal loss caused by the death of Keith Jr. with regards to my personal health.

2.)It is understood that my leave of absence will begin July 17, 1995 and end September 18, 1995.

3.)It is understood that at the end of the 60 day leave of absence, I will return to T.A. Systems, Inc.

4.)It is understood that no salary will be paid during the 60 day leave of absence.

5.)It is understood that *all* commissions due will continue to be paid each Thursday during my leave of absence.

6.)It is understood that no expenses will *be paid during the 60 day leave of absence.*

7.)It is understood that my health insurance through Blue Cross and my dental insurance through Guardian, as well as any life insurance through T.A. Systems, Inc. will remain in effect during the leave of absence and if any monies are due by me they will be paid after September 15, 1995.

Regretfully,

Keith A. Stubl

(Defendant's Exhibit B).

Attached to Stubl's memo was a copy of T.A.'s policy on taking a leave of absence. The policy states:

*Leave of Absence*—A leave of absence may be granted for medical or compelling personal reasons. Leave of absence for sickness is granted when sufficient medical evidence is submitted. Employees should apply by letter for a leave of absence through his supervisor, stating the reason and expected length of leave.

(Defendants' Exhibit B). Stubl's letter did not reference the Family and Medical Leave Act, as he was not aware of the Act. Notice of the Act was not posted in the work place as required by law, and nobody at T.A. attempted to inform Stubl of the Act. (Joint Final Pretrial Order, p. 10).

On July 17, 1995, Stubl began his leave of absence. Around the same time, T.A. employee Irene Le Fevre directed Stubl to see the company doctor to determine whether Stubl had a medical excuse for taking the time off, and whether he was eligible for disability payments.[2] (Peppler Deposition, p. 6). On July 21, 1995, Stubl went to see Doctor Craig Peppler, D.O.[3] Dr. Peppler diagnosed Mr. Stubl as having "prolonged grief reaction." (Peppler Deposition, p. 14).

Dr. Peppler dictated a letter to Principal Mutual Life Insurance Company stating his diagnosis and summarizing the reasons why Stubl needed to take a leave of absence. (Plaintiff's Exhibit 3). Dr. Peppler testified that he suggested Stubl seek psychiatric counseling, but Stubl was not receptive to the idea. Dr. Peppler did not prescribe any medication, as he thought this would just prolong Stubl's grief.

Stubl did not send the letter by Dr. Peppler to T.A. regarding his medical condition nor did T.A. request such a letter. (Joint Final Pretrial Order, p. 10). T.A. claims they did not know Stubl was taking a medical leave, or they would have asked for medical evidence.

Stubl returned to Dr. Peppler's office on August 24, 1995 for a thirty minute visit. Dr. Peppler testified that he has trouble recalling the purpose of the second visit, but his records indicate he held discussion with Stubl, probably assessing if he could return to work.

During his leave of absence, T.A. paid Stubl $11,168.18 in commissions. (Joint Final Pretrial Order, p. 9). Out of these commissions, T.A. deducted $749.76 to cover the

---

**2.** T.A. denies having any knowledge of their employee's referral of Stubl to Dr. Peppler. Mr. Frey's affidavit states that Irene LeFevre, "did not inform T.A. Management of any assistance she provided to Plaintiff in attempting to schedule a doctor's appointment for him." (Defendants' Response to Plaintiff's Answer to Defendants' Motion for Summary Judgment, Exhibit B). This issue is confused by T.A.'s allegation that Ms. LeFevre was Mr. Stubl's girlfriend, with whom he was having an extra-marital affair. (Defendants' Response to Plaintiff's Answer to Defendants' Motion for Summary Judgment, p. 3).

**3.** Dr. Peppler is a licensed osteopath, specializing in occupational medicine.

cost of health insurance premiums incurred by T.A. during Stubl's leave. (Id.)

Stubl returned to work in late August of 1995, and received a raise in January of 1996. (Joint Final Pretrial Order, p. 10). T.A. terminated Stubl on July 31, 1996.(Id.). Stubl claims he was fired because Mr. Frey was angered by Stubl's decision to take leave, over Frey's objection. Stubl claims Frey had mentioned it several times during the months leading up to his termination.

However, Defendants note that Stubl previously testified in his divorce action that he believed he was being terminated because he did not get along with his fellow employees and because T.A. was being sold.[4] During his divorce hearing Stubl never mentioned his personal leave as a potential basis for his dismissal from T.A.[5] Defense counsel addressed the apparent contradiction during Mr. Stubl's deposition in the instant case:

Q. Okay. Now I think your complaint, you state that Ken Frey terminated you because you took a leave of absence under the Family Leave Act?

A. That's correct.

Q. You've previously testified earlier where, that you thought you were terminated because the company was being sold; isn't that correct?

A. Yes.

Q. Okay. Well why did you testify in your divorce proceedings that you thought you were terminated because the company was being sold and—is that because you believed that at that point in time or were you committing perjury then?

A. I answered a question by—my attorney asked me why I felt I was being terminated and I explained to him was one of the reasons was because the company was being sold. Ken Frey told me person-

ally that the new owners, as well as Rick May felt I was making too much money. And there were several other reasons that were not asked of me at that time.

Q. Well, wasn't the question—the question was why were you terminated?

A. One question. I didn't get a chance to elaborate on the other reasons.

Q. So there's more than one reason?

A. Yes.

Q. One of the reasons you were terminated is because the company is being sold?

A. Yes.

* * *

Q. But at the time you were terminated they told you they were terminating you because they could? You were an at-will employee, right?

A. That's correct.

Q. Okay. And prior to your termination there had been discussions about your alleged inability to get along with fellow employees?

A. That's correct.

(Stubl Deposition, pp. 56, 57, 78).

The parties also dispute the facts surrounding the payment of commissions to Mr. Stubl. Stubl's compensation included $60,000 salary plus expenses, benefits and commissions. The commissions were defined in a September 9, 1991 letter drafted by T.A., which read:

**Commission Schedule**
**—2% of first $2,000,000.00 in Sales**
**—1% thereafter**
**—Commission to be paid on Machine Sales only. Not on service orders or parts orders. *Territory is exclusive to Michigan, non-exclusive to other states.* See listing of House Accounts below.**

---

4. A portion of Stubl's divorce proceeding transcript states:

Q: Okay. Why were you terminated from your employment at T.A. Systems?
A: Ken Frey told me I couldn't get along with the front office and management, plant manager and that we met our crossroads. That was it.
* * *
Q: Is there any other reasons you suspect as to why you were being fired.
A: Well he made me privy to the purchase of the company, that they were buying it, inves-

tors were buying it and that they might bring in their own sales force or and or divide up territories.
(Defendants' Exhibit D, p. 53–54).

5. Mr. Stubl argues, and the transcript does reflect, that the divorce referee did not allow Mr. Stubl to illuminate of the reasons why he felt he was fired from T.A. Plaintiff's brief argues: "Had Mr. Stubl been allowed to complete his answer he might well have listed other reasons for his discharge." (Plaintiff's Brief, p. 5).

**Michigan House Accounts:**

| | | |
|---|---|---|
| ASAA | FOCUS GOLF | LECTRON |
| ALLIED | HOLLEY | LESCOA |
| BRANSON | ITT HANCOCK | STAR GASKET |
| CROTTY CORP. | L & M GEAR | WENDT |

We are looking forward to a lengthy term of employment that is mutually beneficial.

(Defendant's Exhibit A) (emphasis added). On January 16, 1996, Mr. Stubl received a similar letter, updating his compensation package and adding the Prince account to the list of house accounts. (Joint Final Pretrial Order, p. 11).

Stubl claims he is entitled to pre-termination commissions from the Prince Corporation account, located in Grand Rapids, Michigan, and the Britax account, also located in Michigan.[6] Stubl claims that because Prince is located in Michigan, he is entitled to the commissions, regardless of whether or not he had anything to do with procuring or servicing the order. The parties agree that Prince was treated as a house account during Stubl's tenure, but disagree as to whether Mr. Stubl agreed to that designation. Mr. Frey claims in his deposition that he and Mr. Stubl agreed that the Grand Rapids representative would handle the account, and that Stubl would not get paid those commissions.[7] Frey also notes that in the three or four years in which T.A. has treated Prince as a house account, they have not heard so much as a "peep" of concern from Mr. Stubl. (Plaintiff's Exhibit 1, pp. 17–18). Mr. Stubl's affidavit contradicts this account:

> I did not reach an agreement with Defendants whereby I would not receive a commission on sales made on the Prince account. They simply refused to pay my commission on the Prince jobs.

(Plaintiff's Exhibit 2, p. 2).

Defendants claim that Stubl raised these pre-termination claims for the first time in Plaintiff's Response to Defendants' Motion for Summary Judgment, and should not be entitled to re-invent their claim at this late date.

Stubl also claims that after he was terminated in July of 1996, T.A. received orders from Textron and Magna, both out-of-state customers, between August and December of 1996. Plaintiff claims he is entitled to post-termination commissions from those sales as well. Defendants claim Stubl was not entitled to a commission on these out-of-state sales unless T.A., in its discretion, agreed to pay a commission prior to the award of the business. (Frey Deposition, p. 20, 22–24). T.A. claims they never told Stubl he would receive a commission on either the Textron or Magna accounts, and that Stubl was not with T.A. to "follow the job" such that he would be entitled to a commission.

Mr. Stubl claims that once he was put to work on an out-of-state job by Mr. Frey, he always received a commission on that job, and as a result he expected that he would receive a sales commission on the Textron and Magna orders.

### III. *STANDARD OF REVIEW*

Summary judgment is proper " 'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[8] According to the *Celotex* Court,

---

**6.** There is very little evidence concerning the Britax account. Plaintiff simply claims, in two paragraphs of the Joint Final Pretrial Order, that T.A. received service calls for the Britax account, and that because it is a Michigan account, he is entitled to commissions.

**7.** The parties agree there was an oral modification of the September 9, 1991, letter to delete certain house accounts, but disagree as to whether Prince was added to the house account list by the oral modification. (Joint Final Pretrial Order, p. 11).

**8.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials."

In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. They are summarized as follows:

\* Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

\* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

\* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

\* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

\* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989). *See also, Nernberg v. Pearce,* 35 F.3d 247, 249 (6th Cir.1994).

10A Charles A. Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice & Procedure,* § 2727,

## IV. *ANALYSIS*

### A. Violations of the FMLA

#### 1. Background and Police of FMLA

Congress enacted the Family and Medical Leave Act in response to a perceived need to allow workers flexibility in scheduling time to deal with family and medical problems and the tensions created by the competing time demands of work and family. As the legislative history indicates:

> [p]rivate sector practices and government policies have failed to adequately respond to recent economic and social changes that have intensified the tensions between work and family. This failure continues to impose a heavy burden on families, employees, employers and the broader society. [This legislation] provides a sensible response to the growing conflict between work and family by establishing a right to unpaid family and medical leave . . . .

Family and Medical Leave Act of 1993, S.Rep. No. 103–3, 103rd Cong., 2nd Sess. 4 (1993), *reprinted in* 1993 U.S.Code Cong. & Ad. News 3, 6.

#### 2. Liability of Individuals Under the FMLA

■ The first issue which must be resolved is whether defendants Ken Batur and Ken Frey, the President and Vice President of T.A., fall under the FMLA's definition of employer such that they are subject to individual liability under the Act.

The term "employer"

> (i) means any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calender work weeks in the current or preceding calender year;
>
> (ii) includes—
>
> (I) *any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer;* and

at 35 (1996 Supp.).

(II) any successor in interest of an employer;

29 U.S.C.A. § 2611(4)(A) (emphasis added).

Although the plain language of section (ii)(I) seems on its face to indicate that an individual who acts on the employer's behalf with regards to an employee, e.g., the employee's supervisor, fits within the definition of employer, and is subject to liability under the Act, the Sixth Circuit has not directly addressed whether individual liability exists in the context of the FMLA, and decisions from other courts are divided on this issue. A recent Sixth Circuit decision concerning individual liability under Title VII further clouds the issue. *Wathen v. General Electric*, 115 F.3d 400 (6th Cir.1997).

One district court construed the term employer the same as the analogous definition of employer in Title VII. *Frizzell v. Southwest Motor Freight*, 906 F.Supp. 441 (E.D.Tenn.1995). In *Frizzell*, the court ruled that the definition of employer in Title VII and the FMLA should be treated the same because both statutes define employer similarly, provide employment related remedies, and exclude small businesses from liability. 906 F.Supp. at 449 (*citing Arnold v. Welch*, 1995 WL 785572 (E.D.Tenn.)).[9] The court then ruled that, because no individual liability exists under Title VII, by analogy no such liability exists under the FMLA.

As noted, the Sixth Circuit recently joined the majority of its sister circuits in holding that an "employee/supervisor who does not otherwise qualify as an 'employer,' cannot be held individually liable under Title VII and similar statutory schemes." *Wathen v. General Electric Company*, 115 F.3d 400, 404 (6th Cir.1997). In rendering its decision, the court relied upon the following decisions from other circuits: *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313 (2d Cir.1995) (holding that "individual defendants with supervisory control over a plaintiff may not be held personally liable under Title VII"); *E.E.O.C. v. AIC Security Investigations, Ltd.*, 55 F.3d 1276, 1282 (7th Cir.1995) (holding that "individuals who do not otherwise meet the statutory definition of 'employer' cannot be held liable under the ADA"); *Lenhardt v. Basic Institute of Technology, Inc.*, 55 F.3d 377, 381 (8th Cir.1995) (finding that supervisors and managers are not subject to individual liability); *Gary v. Long*, 59 F.3d 1391, 1399 (D.C.Cir.), *cert. denied*, (1995) (holding that Title VII does not impose individual liability on supervisory employees); *Smith v. Lomax*, 45 F.3d 402, 403 (11th Cir.1995) (recognizing that employees cannot be held liable under ADEA or Title VII); *Grant v. Lone Star Co.*, 21 F.3d 649, 653 (5th Cir.1994) (holding that Title VII does not permit imposition of liability upon an individual unless they meet Title VII's definition of employer); *Miller v. Maxwell's Intern., Inc.*, 991 F.2d 583, 588 (9th Cir.1993) (holding that individuals cannot be held liable for damages under Title VII and ADEA); *Sauers v. Salt Lake County*, 1 F.3d 1122, 1125 (10th Cir.1993) (holding that under Title VII, suits must proceed against individuals in their official capacities only; individual capacity suits are inappropriate).

The Sixth Circuit, in finding no individual liability, reasoned as follows:

> The majority of circuits addressing this issue have concluded that "[t]he obvious purpose of this agent provision was to incorporate respondeat superior liability into the statute." *Miller*, 991 F.2d at 587 (internal quotation marks omitted). *See also Gary*, 59 F.3d at 1399; *AIC Security*, 55 F.3d at 1281; *Grant v. Lone Star Co.*, 21 F.3d 649 (5th Cir.1994). This common interpretation of the scope of the agent clause in Title VII finds support in the Supreme Court's discussion in *Meritor Savs. Bank v. Vinson*, 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986), wherein the Court stated that "Congress' [sic] decision to define 'employer' to include any 'agent' of an employer ... surely evinces an intent to place some limits on the acts of the employees for which employers under Title VII are to be held

---

9. Section 2000e(b) of Title VII defines "employer" as: "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty of more calender weeks in the current or preceding calender year, *and any agent of such a person*

...." (Emphasis added). The underlined language is similar, although obviously not identical, to the language in the FMLA that includes within the definition of employer "any person who acts, directly or indirectly, in the interest of the employer...."

responsible." *Id.* at 72, 106 S.Ct. at 2408. Notably, while the Supreme Court found that Congress's purpose in including "agent" in the definition of employer was to define the scope of liability of the employer, it said nothing about any liability on the part of the employee/agent.

Moreover, the statutory scheme itself indicates that Congress did not intend to impose individual liability on employees. Title VII limits liability to employers with fifteen or more employees, 42 U.S.C. § 2000e(b), "in part because Congress did not want to burden small entities with the costs associated with litigating discrimination claims." [Footnote omitted]. We agree with the Second Circuit's conclusion that it is " 'inconceivable' that a Congress concerned with protecting small employers would simultaneously allow civil liability to run against individual employees." *Tomka,* 66 F.3d at 1314 (*citing* with approval *Miller,* 991 F.2d at 587). Additionally, as the Second Circuit noted, the legislative history indicates in the floor debates over § 2000e(b), no mention was made of agent liability, further implying that Congress did not contemplate agent liability under Title VII." 66 F.3d at 1314.

Finally, we find that Title VII's remedial provisions are incompatible with the imposition of liability on individual employees for violations of the Act. Before Congress enacted the Civil Rights Act of 1991, 42 U.S.C. § 1981a ("CRA of 1991"), a successful Title VII plaintiff was limited to reinstatement and back pay—remedies available only from an employer. *See Tomka,* 66 F.3d at 1314; *AIC Security,* 55 F.3d at 1281. This limitation on the available remedies suggests that Congress did not intend to allow recoveries against individual employees under Title VII prior to its 1991 amendment. When Congress enacted the CRA of 1991, it added compensatory and punitive damages for intentional discrimination under Title VII. However, Congress calibrated the amounts of compensatory and punitive damages recoverable to the size of the employer, beginning with employers having at least fifteen employees. See 42 U.S.C. § 1981a. [Footnote omitted]. The statute contains no provision for damages to be paid by individuals, further

evidencing a lack of congressional intent to hold individuals liable. "[I]f Congress had envisioned individual liability ... it would have included individuals in this litany of [calibrated] limitations and would have discontinued the exemption for small employers...." *Miller,* 991 F.2d at 588 n. 2. *See also Tomka,* 66 F.3d at 1315.

In sum, we find that the statute as a whole, the legislative history and the case law support the conclusion that Congress did not intend individuals to face liability under the definition of "employer" it selected for Title VII. Accordingly, summary judgment in favor of defendants Murphy, Nyzio and Kerian in their individual capacities under Title VII and KRS Chapter 344 is affirmed.

*Wathen,* 115 F.3d at 405–406.

However, the definitional scope of the FMLA language is textually distinct from that of the Title VII definition of "employer," and most courts have ruled the definition of "employer" under the FMLA is comparable to the definition of employer under the Fair Labor Standards Act ("FLSA"), which has been interpreted more broadly than Title VII to include individual liability for supervisory personnel. *See e.g., Waters v. Baldwin County,* 936 F.Supp. 860 (S.D.Ala.1996); *Knussman v. State of Maryland,* 935 F.Supp. 659 (D.Md.1996); *Johnson v. A.P. Products, Ltd.,* 934 F.Supp. 625 (S.D.N.Y. 1996); *Freemon v. Foley,* 911 F.Supp. 326 (N.D.Ill.1995); *Reich v. Midwest Plastic Engineering, Inc.,* 1995 WL 478884 (W.D.Mich.); *McKiernan v. Smith–Edwards–Dunlap Co.,* 1995 WL 311393 (E.D.Pa.).

While the definition of employer under the FMLA and Title VII are similar, the definition of employer in the FMLA and FLSA are nearly identical. The FMLA defines an employer to include "any person who acts, directly or indirectly, in the interest of an employer," 29 U.S.C. § 2611(4)(A)(ii)(I); the FLSA defines employer as "any person acting directly or indirectly in the interest of an employer." 29 U.S.C. § 203(d).

Further, the regulations promulgated under the FMLA evidence a very clear intent that the definition of the word "employer" be

treated the same under the two statutes and that individuals be included:

> The definition of "employer" in section 3(d) of the Fair Labor Standards Act (FLSA), 29 U.S.C. 203(d), similarly includes any person acting directly or indirectly in the interest of an employer in relation to an employee. *As under the FLSA, individuals such as corporate officers "acting in the interest of an employer" are individually liable for any violations of the requirements of the FMLA.*

29 C.F.R. § 825.104(d) (emphasis added). *See also, Waters,* 936 F.Supp. at 863; *McKiernan,* 1995 WL 311393 at 3.[10] Thus, the regulation expressly states that the FMLA definition of "employer" should be construed the same as under the FLSA and that individual liability for corporate officers, managers, and supervisors for violations of the FMLA is within the scope of the definition.[11]

In the Court's view, this regulatory interpretation reflects the plain meaning of the definition of "employer" in the statute, which includes any person who acts directly or indirectly on behalf of the employer. Although reasonable arguments could be made that the policy rationale underlying the Title VII decisions finding no individual liability should dictate the same result under the FMLA, the plain language of the statute and the regulations mandate otherwise. The first recourse of statutory interpretation is the language of the statute itself, and no matter how compelling the policy rationale is to the contrary, where the language is clear, that language must prevail until Congress sees fit to change it.

In this case, the parties have stipulated that Ken Frey and Ken Batur acted directly in the interest of T.A. with regards to Mr. Stubl. (Joint Final Pretrial Order, p. 9). Therefore, Mr. Frey and Mr. Batur fit under the definition of employer, and are subject to individual liability under the Act. According-

ly, Defendants' Motion for Summary Judgment on this issue is denied.

### 3. Coverage Under the Act

To be eligible for FMLA leave, an employee must have been "employed (i) for at least 12 months by the employer with respect to whom leave is requested ...; and (ii) for at least 1,250 hours of service with such employer during the previous 12–month period." 29 U.S.C. § 2611(2). As noted above, employers covered by the FMLA include "(i) ... any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year ..." 29 U.S.C. § 2611(4). Neither Plaintiff nor Defendants dispute that they are both within the jurisdictional ambit of the FMLA—Plaintiff has worked regularly for Defendant since 1991 and Defendant regularly employs more than 50 employees. *See* 29 U.S.C. § 2611.

However, Defendants argue that Plaintiff's leave does not fall within the Act because: (1) Plaintiff notified T.A. he was going on personal leave, as opposed to medical leave; (2) Stubl did not see a doctor before taking his leave, and never submitted any medical evidence to T.A.; and (3) Stubl did not receive "treatment" such that his illness could be considered a "serious health condition" under the Act.

Mr. Stubl's July 5, 1995 letter stated that he needed "some personal time off work." However, Mr. Stubl's letter also stated that both parties should understand that "I am taking this leave of absence based on my personal loss caused by the death of Keith Jr. *with regards to my personal health."* Attached to Stubl's letter was a memorandum from T.A. Systems Employee Manual, which permits an employee to take a leave of

---

**10.** *See also,* Morris, *Selected Update on Federal and State Statutory Developments,* SB07 ALI–ABA 723, 756 (1996) ("Under developing FMLA case law, supervisors or managers who are involved in terminating an employee may be individually liable for violations of the FMLA. Although one district court holds otherwise, this conclusion is supported by the FMLA definition of "employer" and the FMLA regulations which both rely on the FLSA as precedent for holding employees personally liable for these statutory wrongs.").

**11.** There is no dispute that individual liability exists under the FLSA. *See, e.g., Falk v. Brennan,* 414 U.S. 190, 195, 94 S.Ct. 427, 431, 38 L.Ed.2d 406 (1973).

absence for medical or compelling personal reasons, but requires the submission of "sufficient medical evidence" to support such leave. (Defendants' Exhibit A). T.A. argues that Mr. Stubl's undisputed failure to provide them with sufficient medical evidence of his sickness, along with his statement in the letter that the leave was "personal," indicate his leave is not covered under the Act.

■ Section 2612(e)(2)(B) requires an employee to provide notice to the employer, expressing his or her intention to take the leave of absence. In instances in which the need for leave is unforeseeable, notice is to be provided as soon as practicable, i.e., at least one or two days in advance of taking the leave. 29 C.F.R. § 825.302(b). On July 5, 1995, Stubl notified T.A. of his intention to take a leave of absence beginning on July 17, 1995. Given the unforeseeable death of his son only a month earlier, and his subsequent realization that he could not continue working, the Court finds that two weeks notice was reasonable. Therefore, Mr. Stubl's notice to T.A. meets the temporal dimension of the notice requirement.

■ Furthermore, Stubl's letter, fairly read, was sufficient to put T.A. on notice that his leave was covered under the Act. "The employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed." 29 C.F.R. § 825.303 (1995). *See also, Price v. City of Fort Wayne,* 117 F.3d 1022, 1026 (7th Cir.1997); *Manuel v. Westlake Polymers Corp.,* 66 F.3d 758, 763 (5th Cir.1995); *George v. Associated Stationers,* 932 F.Supp. 1012, 1016 (N.D.Ohio 1996); *Brannon v. OshKosh B'Gosh, Inc.,* 897 F.Supp. 1028, 1038 (M.D.Tenn.1995); *Hendry v. GTE North, Inc.,* 896 F.Supp. 816, 828 (N.D.Ind.1995).[12]

The obligation then shifts to the employer to obtain any additional required information through informal means. 29 C.F.R. § 825.303(b). *See also, Price,* 117 F.3d at 1026; *Brannon,* 897 F.Supp. at 1038; *Hendry,* 896 F.Supp. at 828. "In all circumstances, it is the employer's responsibility to designate leave, paid or unpaid, as FMLA

qualifying, and to give notice of designation to the employee." *Price,* 117 F.3d at 1026 (*citing* 29 C.F.R. § 825.208(a)).

In this case, Stubl informed T.A. of his need for leave, citing the impact of his son's death on his personal health as the impetus for his leave. At that point, the burden shifted to T.A. to designate the leave as FMLA-qualifying, and to obtain additional information to make that determination, if necessary. T.A. claims they did not inquire further because Stubl did not specify he was taking a medical leave. However, Stubl's letter stating that he was taking a leave for reasons related to his health put T.A. on notice of the possibility his leave was FMLA-qualifying, which is all the Act requires of the employee.

Defendants argue that this case is distinguishable because their internal procedures require employees to give medical certification for sick leave, as opposed to personal leave. Section 825.305(a) allows a company to impose this requirement: "An employer may require that an employee's leave ... be supported by certification issued by a health care provider of the employee...." However, § 825.305(a) states that when an employer requires certification issued by a health care provider, the "employer must give notice of a requirement for medical certification *each time a certification is required ...*." (Emphasis added). *See also, George,* 932 F.Supp. at 1016 ("If the company required medical certification in conjunction with a leave request, it was required to give notice of its demand to George.") (*citing* 29 C.F.R. § 825.305). In this case, Stubl affixed a copy of T.A.'s leave policy to his letter requesting leave. The policy clearly stated that medical leave "is granted when sufficient medical evidence is submitted." Therefore, because Stubl had actual notice of this internal requirement at the time he requested his leave, it could be argued that additional notice would have been redundant and unnecessary.

While this seemingly indicates that Mr. Stubl's leave is not covered because he failed to comply with T.A.'s internal requirement,

---

**12.** In *Manuel,* the court rejected the contention that the FMLA requires employees to invoke the Act by name, and to specific subparagraphs

therein, stating, "These are workers, not lawyers." 66 F.3d at 763.

T.A.'s purported notice was seriously defective. Under the pertinent regulations, the notice from the employer must detail the specific expectations and obligations of the employee and explain any consequences of a failure to meet these obligations, 29 C.F.R. § 825.301(b)(1), including any requirement for the employee to provide medical certification and the consequences of the failure of doing so, 29 C.F.R. § 825.301(b)(1)(ii). If a company's notification is conveyed via an employee manual, as in this case, the instrument must clearly incorporate information on FMLA rights and responsibilities and the employer's policies regarding the FMLA. 29 C.F.R. § 825.301(a)(1).

More importantly, "an employer that fails to post the required notice cannot take any adverse action against an employee, including denying FMLA leave, for failing to furnish the employer with advance notice of the need to take FMLA leave." 29 C.F.R. § 825.300(b). *See Hendry*, 896 F.Supp. at 828 (the regulations provide that a non-posting employer is estopped from taking adverse action against an employee who fails to furnish the employer with advance notice of a need to take FMLA leave).

Here, it is undisputed that T.A. never informed Mr. Stubl of his rights under the FMLA. (Joint Final Pretrial Order, p. 10). Although the employee manual gave notice of T.A.'s internal requirement, it failed to alert Stubl of his rights under the FMLA, such as his right to have his insurance maintained at the employer's expense during his leave. Perhaps if T.A. had apprised Mr. Stubl of his rights, as required by law, he would have provided medical certification to T.A. to ensure that he would qualify for coverage under the Act. Presumably the regulations include these notification provisions to ensure the employee has all of the information he or she needs to make an educated decision. T.A.'s failure to notify Stubl pre-dated Stubl's failure to provide medical certification, and may well have contributed to that failure. Therefore, because T.A. failed to inform Mr. Stubl of his rights and obligations under the Act, the Court finds that Stubl's failure to provide medical certification to comply with T.A.'s internal procedures does not preclude him from being covered under the Act.

Ultimately, the "critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition." *Manuel*, 66 F.3d at 764. In this case, despite Stubl's failure to provide medical certification in conformity with T.A. company policy, Stubl's letter stating he was taking leave because of his son's suicide effect on his health was sufficient to apprise T.A. that the FMLA may have covered Mr. Stubl's leave.

▆▆▆▆ Defendants also claim Stubl is not covered by the Act because he failed to seek medical treatment before beginning his leave. The FMLA does not require that the employee must have received medical treatment at the time he gave notice of illness to his employer. *George*, 932 F.Supp. at 1016. While a fair reading of Defendants' internal procedures indicates that medical evidence must first be submitted to the employer before a medical leave will be granted, T.A. did not provide notice of this need for certification in accordance with § 825.305(a). This failure, combined with T.A.'s failure to post notice of the Act, leads us to conclude that Mr. Stubl's medical examination, which occurred after the commencement of his leave, was sufficient to bring him within the protection of the Act.

▆▆▆ Defendants next contend that Plaintiff did not receive "treatments" under the Act, such that his illness could be considered a "serious health condition" under the Act. The FMLA permits employees "to take job-protected, unpaid leave ... for up to a total of 12 workweeks in any 12 months ... because the employee's own serious health condition makes the employee unable to perform the functions of his or her job." 29 C.F.R. § 825.100.

> The term "serious health condition" means an illness, injury, impairment, or physical or mental condition that involves—
>
> (A) inpatient care in a hospital, hospice, or residential medical care facility; or
>
> (B) continuing treatment by a health care provider.

29 U.S.C. § 2611(11). "Continuing treatment" includes treatment two or more times

by a health care provider. 29 C.F.R. § 825.114.

Defendant claims that Stubl's visits to a doctor did not constitute "treatment." Citing both Mr. Stubl's and Dr. Peppler's depositions, Defendants claim the sole purpose of the visit was an effort by Stubl to obtain disability benefits from his short term disability carrier.

Q. You went in to see him and told him about the difficulties you were having and told him that you needed a letter for an insurance company?

A. The Insurance Company requested it.

Q. Okay. They needed a letter from a doctor so you could get your disability?

A. That's correct.

(Stubl Deposition, p. 74). Defendants also contend that Stubl received no recognizable treatment from Dr. Peppler.

Q. All right. Did Mr. Stubl, do you recall, mention to you that, you know, he needed some type of letter to send to the insurance company to see if he could get some disability benefits?

A. That was pretty much the purpose of the visit, as I recall.

* * *

Q. Could you specifically define the treatment that you gave Mr. Stubl?

A. Well, that's—that's where I'm having a little difficulty because, you know, in the unusual type of treatment that I offer, I'd prescribe medication or, you know, perform some type of help for the patient. In

Mr. Stubl's case, that help was to work with him to try to get the insurance company to give him the benefits, I think. So, you know, I wrote him a letter, which I think was the main extent of his treatment.

(Peppler Deposition, 8, 16, 17).

While it may be true that the primary purpose of Stubl's doctor's visit was to procure a letter to send to the disability carrier, the doctor still had to perform a diagnosis and evaluation before he could issue such a letter. Under the regulations, "treatment" includes "examinations to determine if a serious health condition exists and evaluations of the condition." 29 C.F.R. § 825.114(b).[13] Dr. Peppler's examination of Mr. Stubl clearly qualifies under this definition. Dr. Peppler diagnosed Mr. Stubl as having "prolonged grief reaction," and evaluated his condition, concluding that he needed a leave of absence from T.A. because he could not perform the functions of his job.[14] (Peppler Deposition, p. 15). The doctor opined that he was giving Mr. Stubl "treatment" for his emotional state, and chose not to prescribe any medication he felt it was better for Stubl to work through the grief than try to pharmacologically numb the reaction. (Peppler Deposition, p. 14). Stubl later had a follow up visit with Dr. Peppler which, although Dr. Peppler could not recall the exact purpose of, was no doubt to assess whether Mr. Stubl could return to work.

These two doctor's visits constituted "continuing treatment" under the regulation's

---

**13.** See Price, 117 F.3d at 1024. In Price, the court ruled that several diagnosis, none of which alone rose to the level of a serious health condition, constituted such a condition when taken together. The court ruled the employee presented sufficient evidence to withstand summary judgment, stating: [The doctor] concludes that she "was on the edge of a break-down, both physically and mentally;" that "there was no way [Price] could perform her job, due to her mental and physical state, and ... that to attempt to continue work in her condition would be seriously detrimental to her health." Price, 117 F.3d at 1025.

**14.** Dr. Peppler's letter to Principal Mutual Life Insurance Company had a caption reading, "Diagnosis: Prolonged grief reaction with inability to work (309.23)," and stated in part:

Mr. Stubl is a patient of mine and is unable to continue working for approximately the next 2–3 months due to an extreme grief reaction after the suicide of his 15 year old son .... he has experienced extreme emotional liability, has been unable to concentrate sufficiently to complete his work assignments and has been experiencing excessive sleep disturbance such that he is fatigued most of the time.

* * *

However, I feel that at this time, it would be best for him to take time off work so that he may work through his grief with his family on a full time basis.

* * *

At the present time, I do not feel that medication would be indicated as these can have an effect of prolonging the grief reaction. As to Mr. Stubl's prognosis, I believe he should he considered totally disabled from his occupational activities.

definition. *See,* 29 C.F.R. § 825.114. In *George v. Associated Stationers,* 932 F.Supp. 1012 (N.D.Ohio 1996), the court ruled that two doctor's visits for the purpose of diagnosis and evaluation constituted continuing treatment under the regulations. In that case, William George fell ill and went to the emergency room, where he was diagnosed as having the chicken pox. The doctor opined that he could not work because of the highly contagious nature of the condition until George returned to the doctor for a follow-up, at which time the doctor told him he could return to work. The court rejected the defendant's contention that "ailments which require only home care, rest, or over the counter drugs, do not qualify as serious health conditions," and ruled that he was covered under the FMLA because he had the requisite two treatments (the second examination pursuant to the doctor's orders), and was told by his physician that he could not work.

Stubl's presentation of Dr. Peppler's unrebutted medical testimony is sufficient to withstand Defendants' motion for summary judgment. T.A. does not dispute Stubl's diagnosis of prolonged grief reaction, nor do they dispute that he could not work during the period in question. Furthermore, it is significant that the diagnosis and evaluations were performed by T.A.'s own company doctor, although not at the instigation of T.A. management. Given the above analysis, the Court finds Mr. Stubl's leave is covered by the FMLA.[15]

Throughout their brief, Defendants argue that they would have comported with the requirements of the Act if Plaintiff would have notified them he was taking medical leave. What Defendants fail to appreciate, however, is that once Stubl informed them he was taking leave because of his health condition, the burden shifted to T.A. to determine whether his leave qualified for protection under the Act. Therefore, the Court finds Stubl's leave is covered by the Act.

### 4. Liability for Unpaid Insurance Premiums

When Stubl returned from his leave, T.A. deducted $749.76 from Stubl's payroll for the cost of medical insurance coverage incurred by the company during his leave. The parties bring cross-motions for summary judgment to determine whether T.A. violated the Act by failing to maintain Stubl's coverage under the company's group health plan for the duration of his leave.

T.A. has stipulated that if Stubl's leave is covered by the FMLA, T.A. is obligated to pay his insurance premiums accrued during his leave of absence. (Joint Final Pretrial Order, p. 8). Section 2614(c)(1) of the Act provides:

> during any period that an eligible employee takes leave under section 2612 of this title, the employer shall maintain coverage under any "group health plan" (as defined in section 5000(b)(1) of Title 26) for the duration of such leave at the level and under the conditions coverage would have been provided if the employee had continued in employment continuously for the duration of such leave.

Because the Court has already found that Stubl's leave was covered by the Act, it grants Plaintiff's motion for summary judgment seeking reimbursement for the $749.76 deducted from his payroll for the amount of medical insurance coverage incurred by T.A. during his leave. Furthermore, pursuant to 29 U.S.C.A. § 2617, Plaintiff is entitled to liquidated damages in the same amount, and interest on the original amount.

### 5. FMLA Discrimination Claim

This, of course, does not end the inquiry. The Court must still determine whether De-

---

**15.** The Court confesses that it is somewhat skeptical as to whether Mr. Stubl's two doctor's visits should be considered "continuing treatment" such that Plaintiff suffered a "serious health condition" within the meaning of the FMLA statute itself. The breadth of the regulations in permitting two visits to a physician for the purpose of diagnosis to constitute "continuing treatment" raises a serious question as to whether the regulations accurately reflect Congressional intent on the issue of what should constitute a "serious health condition." Clearly this broad definition of "continuing treatment" could open the statute to abuse. However, the issue of whether the regulations exceed the scope and intent of the statute was not raised by the parties and the Court is not certain enough of this view to strike down the regulations sua sponte.

fendants' conduct constitutes discrimination under the Act. To enforce the rights provided to employees under the FMLA, Congress provided that: "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter, 29 U.S.C. § 2615(a)(1), ... [or] to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter," 29 U.S.C. § 2615(a)(2). Accordingly, "[a]n action to recover the damages or equitable relief prescribed [in the FMLA] may be maintained against any employer ... in any Federal or State court of competent jurisdiction by any one or more employees ..." 29 U.S.C. § 2617.

■ To bring a § 2615(a)(2) action and survive a defendant's motion for summary judgment, a plaintiff must demonstrate a prima facie case. Although no guidelines have yet been established for a prima facie showing under the FMLA, other courts faced with this situation have applied the prima facie requirements of other workplace discrimination and retaliation statutes, most notably Title VII, and the Americans with Disabilities Act (the "ADA"). *See. e.g., Oswalt v. Sara Lee Corp.*, 889 F.Supp. 253, 259 (N.D.Miss.1995), *aff'd*, 74 F.3d 91 (5th Cir. 1996); *Day v. Excel Corp.*, 1996 WL 294341, *12–13 (D.Kan.1996) (unpublished); *Barth v. Gelb*, 2 F.3d 1180, 1183–84 (D.C.Cir.1993); *Lempres v. CBS Inc.*, 916 F.Supp. 15, 23 (D.D.C.1996); *Ilhardt v. Sara Lee Corp.*, 1996 WL 535236, *9 (N.D.Ill. Sept.18, 1996) (unpublished). The prima facie and burden-shifting analysis set out below can also be found in cases involving the Age Discrimination in Employment Act ("ADEA"). *See, e.g., Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325 (6th Cir.1994); *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 379 (6th Cir.1993). Thus, a prima facie case for a § 2615(a)(2) claim requires proof that Plaintiff:

(1) engaged in an activity protected by [the FMLA]; (2) that this exercise of his [or her] protected rights was known to defendant; (3) that defendant thereafter took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action.

*Canitia v. Yellow Freight System, Inc.*, 903 F.2d 1064, 1066 (6th Cir.1990). *See also, Oswalt*, 889 F.Supp. at 259; *Ilhardt*, 1996 WL 535236 at *9.

The court has already ruled that Plaintiff was engaged in protected conduct known to Defendants. Furthermore, the parties have stipulated T.A. terminated Stubl in July of 1996. Therefore, the first three prongs of Plaintiff's prima facie case have been satisfied.

Under the fourth prong of his claim, Plaintiff must offer evidence that there was a causal connection between the protected activity and the adverse employment action. While the Sixth Circuit has stated that it will look to the temporal proximity of the adverse action to the protected activity to determine whether there is a causal connection, other evidence in the record is often required, especially where more than a few days or weeks have passed. *See, e.g., Harrison*, 80 F.3d at 1118–1119. Thus, Plaintiff's reliance on the ten-month time period between his leave and termination to establish a causal connection, without more, appears weak.

However, *for the purposes of deciding this summary judgment motion only*, the Court will assume that the 10 months between Plaintiff's return from his FMLA leave and his termination is sufficient to raise at least an inference of a casual connection for making out a § 2615(a)(2) prima facie case.[16]

■ But, even assuming, *arguendo*, that Plaintiff has established a prima facie case under the FMLA for his § 2615(a)(2) claim, his claim nevertheless must fail be-

---

**16.** The Court is comfortable assuming elements of prima facie cases *arguendo* for summary judgment purposes because the Sixth Circuit has stated,

[b]ecause we follow the *Burdine* framework, we do not examine the adequacy of [the plaintiff's] proofs at the various stages of the *Burdine* analysis. As the [U.S.] Supreme Court

explained in *U.S. Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1481–1482, 75 L.Ed.2d 403 (1983), 'once all the evidence is in, the *Burdine* proof structure is no longer relevant.'

*Holmes v. Perry*, 95 F.3d 1152, 1996 WL 490422, *3 (6th Cir.1996) (unpublished).

cause Defendants have provided legitimate, non-discriminatory reasons for his termination which Plaintiff has not shown to be pretextual. Under the FMLA, once the plaintiff proves his or her prima facie case, the burden then shifts to the employer to "articulate some legitimate non-discriminatory reason for the employee's discharge." *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 379 (6th Cir.1993) (*quoting McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973)). *See also, Carpenter v. Western Credit Union*, 62 F.3d 143, 144 (6th Cir. 1995); *Oswalt*, 889 F.Supp. at 259.

> If the employer meets the burden of articulation, then the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the reason proffered by the employer was not its true reason, but merely a pretext for discrimination. [*Ang v. Procter & Gamble*, 932 F.2d 540, 549 (6th Cir.1991)].

> A plaintiff can prove pretext "by showing that the Company's reasons have no basis in fact, or if they have a basis in fact, by showing that they were not really factors motivating the discharge, or, if they were factors, by showing that they were jointly insufficient to motivate the discharge." *Ridenour v. Lawson Co.*, 791 F.2d 52, 56 (6th Cir.1986).

*Cooley*, 25 F.3d at 1329–1330.[17] The plaintiff cannot withstand summary judgment merely by denying the defendant's articulated legitimate reasons without producing substantiation for the denial. *See, Mitchell v. Toledo Hospital*, 964 F.2d 577, 585 (6th Cir.1992).

In this case, Defendants have put forth several nondiscriminatory reasons for discharging Mr. Stubl. One alleged reason was Mr. Stubl's inability to "get along" with his fellow employees. Mr. Stubl admitted in deposition that prior to his termination, there had been discussions about his inability to get along with his co-workers (Stubl Deposition, p. 78), including Stubl's statement to T.A.'s President and Owner, Ken Batur, that he did not like him (Joint Final. Pretrial Order, p. 10). Stubl's deposition also indicates he believed he lost his job because the company was being sold, and the new owners thought he was making too much money. (Stubl Deposition, p. 56–57). The presentation of these viable rationales shifts the burden to Mr. Stubl to prove by a preponderance that the T.A.'s reasons are pretextual.[18]

Mr. Stubl does not possess any written evidence to support his claim that he was terminated as a result of his leave of absence. (Joint Final Pretrial Order, p. 10). The only evidence Mr. Stubl has produced to support his claim of discrimination, aside from the temporal proximity between his leave and termination, is his sworn affidavit, which states:

> Mr. Frey was angered by my taking leave in 1995 and remained angry about it right up until he fired me. He mentioned it several times during the months between leave and the date he actually fired me. I believe my having taken this leave over his objection *was one of the reasons for my discharge from employment.*

(Plaintiff's Exhibit 2) (emphasis added). This bare allegation, unsupported by any concrete evidence, does not prove by a preponderance that T.A.'s proffered reasons were pretextual. Mr. Stubl's affidavit does not prove that T.A.'s reasons have no basis in fact, or that the factors did not motivate his discharge.[19] Rather, Stubl's admission that

---

17. *See also, Monette v. Electronic Data Systems*, 90 F.3d 1173, 1179 (6th Cir.1996) (if defendants come forward with evidence of a legitimate reason for its action, the inference shifts from a mandatory one the fact finder must draw, to a permissive one that the fact finder may draw, and the burden shifts back to [Plaintiff] to establish [by a preponderance] that the employer's proffered explanation is a mere pretext for unlawful discrimination) (*citing St. Mary's Honor Center. v. Hicks*, 509 U.S. 502, 510–11, 113 S.Ct. 2742, 2748–49, 125 L.Ed.2d 407 (1993)); *LaPointe*, 8 F.3d at 379; *Ligon*, 935 F.Supp. at 939–940.

18. Defendants do not need to persuade the Court it was actually motivated by the proffered reasons, so long as the reasons are legally sufficient to justify a judgment for Defendants. *Cooley*, 25 F.3d at 1329 (*citing West v. Wright Constr. Co.*, 756 F.2d 31, 33 (6th Cir.1985)).

19. Furthermore, the Court is not even certain whether it is proper to entertain Mr. Stubl's affidavit, which was provided *after* Defendants' filed their summary judgment brief. The Court is uncertain whether the affidavit contradicts his prior deposition testimony as to why he was fired, because the parties have failed to submit

several reasons existed for his discharge reenforces that those reasons were not pretextual.

Therefore, because Plaintiff has failed to show that Defendants proffered reasons for his termination were not pretextual, Defendants' motion for summary judgment on this issue is granted.

## B. Breach of Employment Contract and Overdue Commissions

Mr. Stubl also claims that Defendants breached his employment contract by failing to pay him pre-termination and post-termination commissions on approximately four accounts. Defendants argue that Mr. Stubl's recovery of allegedly overdue commissions is precluded by his failure to exhaust administrative remedies, and, in the alternative, that T.A. has paid Mr. Stubl all of the commissions rightfully due to him.

### 1. Failure to Exhaust Administrative Remedies

■ Defendant argues that because Plaintiff has failed to exhaust the administrative remedies under Michigan's Wages-and-Fringe Benefits Act, the Court is without jurisdiction to hear his claim. The Act states:

An employee who believes that his or her employer has violated the act *may* file a written complaint with the department within 12 months after the alleged violation.

M.C.L. § 408.481 (emphasis added). In *Duncan v. Rolm Mil–Spec Computers*, 917 F.2d 261, 266 (6th Cir.1990), the Sixth Circuit held that the word "may" actually meant "shall" in the context of the Act.[20] The Court

stated that under Michigan law "the administrative remedies must be pursued before a grievant may seek legal redress in the courts." (*Citing Cockels v. International Business Expositions*, 159 Mich.App. 30, 36, 406 N.W.2d 465, 468 (1987)).

Federal courts have twice disavowed *Duncan's* interpretation of Michigan law. *See, e.g., Hebein v. Ireco, Inc.*, 827 F.Supp. 1326 (W.D.Mich.1993) (Section 408.481 sets up an administrative remedy that is an alternative to court action at the election of the employees); *Conrad v. Rofin–Sinar, Inc.*, 762 F.Supp. 167 (E.D.Mich.1991) (expressly disavowing *Duncan*, and stating that no court in Michigan has held that a common law claim for past due employee compensation requires that a claim be filed initially with the Department of Labor). In *Conrad*, the court explained its decision not to follow *Duncan*:

In any event, the Court respectfully suggests that the Sixth Circuit's conclusion stems from a misinterpretation of Michigan law. No court in Michigan has held that a common law claim for past due employee compensation requires that a claim be filed initially with the Michigan Department of Labor. The Opinion and Order from which the *Duncan* appeal was taken, [cite omitted], merely held that if a plaintiff relies on the MWFBA then he or she must exhaust the administrative remedies under it.

The Sixth Circuit found support for the sweeping exhaustion requirement in *Cockels v. International Business Expositions*, [cite omitted]. However, the plaintiff's claim in *Cockels* sought to enforce a right arising directly under a provision in the

the full text of Mr. Stubl's deposition. If the affidavit contradicts, rather than merely supplements, Mr. Stubl's deposition, the Court would not consider the affidavit in ruling on this summary judgment motion. *See. e.g., Reid v. Sears, Roebuck and Co.*, 790 F.2d 453, 460 (6th Cir. 1986); *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 496 (5th Cir.1996) (when an affidavit merely supplements rather than contradicts prior deposition testimony, the court may consider the affidavit when ruling upon a summary judgment motion).

**20.** The Court reasoned as follows:

Because other statutory language indicates a contrary legislative intent, we hold that use of

the word "may" in section 408.481(1) does not permit a claimant to file a civil action prior to seeking administrative relief.
* * *
The preamble also clearly states that one of the purposes of the act is to provide for settlement of disputes regarding wages. The Michigan Court of Appeals has stated, "In order to provide for an expeditious settlement of a dispute regarding wages or fringe benefits the Act also provides that disputes are to be handled, initially, by the Department of Labor." *Carpenter v. School Dist. Of City of Flint*, 115 Mich.App. 683, 687, 321 N.W.2d 772, 774 (1982) (*citing* Mich. Comp. Laws 408.481).
*Duncan*, 917 F.2d at 266.

MWFBA, [cite omitted], that provided a new statutory remedy for employees who are victims of retaliatory termination. The decision offers no support for the position that all wage claims, even if they are not based on a provision in the MWFBA, must be filed with the Michigan Department of Labor. [Cites omitted].

*Conrad*, 762 F.Supp. at 172.

Although this court finds *Conrad's* explanation of *Duncan* persuasive, it has reservations about that decision's avoidance of the clear precedent that existed at the time it was rendered. However, subsequent Michigan appellate decisions have vindicated *Conrad's* analysis, and to the extent that *Duncan* attempted to construe the Michigan statute when it was decided in 1990, that statutory construction has been rejected by subsequent Michigan appellate decisions directly on point.

In *Faulkner v. Flowers*, 206 Mich.App. 562, 569, 522 N.W.2d 700 (1994), the Michigan Court of Appeals held that administrative and civil remedies are overlapping remedies for an employee whose employment is terminated for reporting wage and fringe benefit violations. Similarly, in *Murphy v. Sears, Roebuck & Company*, 190 Mich.App. 384, 387–388, 476 N.W.2d 639 (1991), the Court of Appeals held that an employee is not required to exhaust remedies under MWFBA before instituting suit against employer premised on common law breach of contract, as a statutory remedy for enforcement of a common law right is deemed cumulative.

■ Thus, two subsequent Michigan appellate decisions directly contradict *Duncan*. Where a federal court's interpretation of state law is specifically contradicted by a subsequent state appellate court ruling, the federal district court should adopt the state court's interpretation. *Nussbaum v. Mortgage Service America*, 913 F.Supp. 1548 (S.D.Fla.1995) (*citing Roboserve, Ltd. v. Tom's Foods Inc.*, 940 F.2d 1441, 1451 (11th Cir.1991)).[21] Therefore, although this Court is generally bound by relevant Sixth Circuit precedent construing Michigan law (*Conrad's* analysis not withstanding), it is not so bound when subsequent Michigan appellate law is to the contrary, unless it is persuaded that the Michigan Supreme Court would rule the same way as the Sixth Circuit.

Here, the state appellate court decisions are persuasive in their analysis of the statute's language and this Court cannot ignore the plain wording of the statute itself. The common meaning of the word "may" is to "have the ability to" or "have permission to." The very essence of the word indicates a permissive or discretionary act, not a mandatory one. Though the Court understands that in extraordinary circumstances the word "may" is interpreted to mean "shall," the Court finds no such circumstance in this Michigan statute. For these reasons, the Court holds Mr. Stubl need not exhaust his available administrative remedies before commencing suit in this Court.

**2. Pre–Termination Commissions**

■ Mr. Stubl claims, in his answer to Defendants' summary judgment motion, he is entitled to pre-termination commissions from the Prince and Britax accounts. However, when Stubl was asked at his deposition what commissions he was seeking in his complaint, he responded only that he was seeking commissions on the Textron and Magna accounts. Subsequently, Mr. Stubl and his attorney visited T.A. to look through its files,

---

21. *See also, Taco Bell Corporation v. Bloor Automotive, Inc.*, 924 F.2d 1059, 1991 WL 11618 (6th Cir.(Mich)) (unpublished disposition) ("our task as a federal court is to decide the issues of contractual interpretation or enforcement in accordance with Michigan law as reflected in both past and anticipated decisions of the Michigan Supreme Court. [Cite omitted]. Decisions of the Michigan Court of Appeals are indicative of how the Michigan Supreme Court would rule on an issue.").

In *Nussbaum*, the court noted that the Eleventh Circuit was not alone in considering a more recent interpretation of state law by state courts to justify a reconsideration of circuit precedent. *See, Jones–Hamilton v. Beazer Materials & Services*, 973 F.2d 688, 696 n. 4 (9th Cir.1992); *Derflinger v. Ford Motor Co.*, 866 F.2d 107, 110 (4th Cir.1989); *Broussard v. Southern Pac. Transp. Co.*, 665 F.2d 1387 (5th Cir.1982); *Singletary v. Southeastern Freight Lines, Inc.*, 833 F.Supp. 917 (N.D.Ga.1993) ("a federal court should follow the latest appropriate decision at whatever point in the federal proceedings it comes.").

and Stubl's counsel verified via correspondence that Stubl had no commission disputes other than the Textron and Magna claims, except for several minor disputes totaling less than $100. Defendants argue that Plaintiff should be bound by these statements, and, therefore, should not be able to pursue these untimely claims.

Despite this evidence, Plaintiff argues T.A. should have been on notice of his pre-termination claims because on May 15, 1997, some two weeks before the close of discovery, Plaintiff served Defendants with Second Interrogatories and Third Request for the Production of Documents, which sought information relating to the Britax and Prince accounts. (Plaintiff's Supplemental Brief, Exhibit A). Defendants refused to provide this information, and Plaintiff filed a Motion to Compel on June 24, 1997, which was granted by Magistrate Judge Carlson on August 18, 1997. (Plaintiff Supplemental Brief, Exhibit B).

■ However, Mr. Stubl's only evidence in support of his pre-termination claims is his affidavit of July 3, which contradicts his earlier deposition testimony. A party cannot create a factual issue by submitting an affidavit that contradicts or substantially supplements his or her deposition testimony. *Reid v. Sears, Roebuck and Co.,* 790 F.2d 453, 460 (6th Cir.1986). *See also, Jones v. General Motors,* 939 F.2d 380, 385 (6th Cir.1991); *Thompson v. Simon United States Holdings, Inc.,* 956 F.Supp. 1344, 1351 (N.D.Ohio 1997). Mr. Stubl's July 3 affidavit, sworn after Defendants submitted their summary judgment motion, stated "I did not reach an agreement with Defendants whereby I would not receive a commission on sales made on the Prince account. They simply refused to pay my commission on the Prince Corporation jobs." (Plaintiff's Answer to Defendants' Motion for Summary Judgment, Exhibit 2). However, on May 2, 1997 defense counsel directly asked Plaintiff which commissions he was seeking, to which Plaintiff responded:

Q: Now [Plaintiff's complaint] says Defendant T.A. Systems has breached its contract with plaintiff by failing and refusing

to pay plaintiff's substantial commission on sales procured by plaintiff or defendant. What sales are looking for a commission on?

A: Textron and Magna.

(Stubl Dep., pp. 80–81).[22] Plaintiff cannot now use his affidavit to effectively change his deposition answer to, "Magna, Textron, Britax, and Prince." This answer would be, of course, materially different from his deposition response, and Plaintiff offers no justification for correcting his seemingly incomplete testimony at this late date. Allowing Plaintiff to contradict, or materially supplement his deposition testimony at this stage, "would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Reid,* 790 F.2d at 460.

Further, Plaintiff's initiation of discovery regarding his pre-termination accounts does not alter this analysis. If Plaintiff wanted to annex his commissions claims to include the Prince and Britax accounts, he would have had to correct his materially incomplete deposition testimony pursuant to Rule 26 of the Federal Rules of Civil Procedure:

(e) A party who has made a disclosure under subdivision (a) [which includes depositions] or responded to a request for discovery with a disclosure or response is under a duty to supplement or correct the disclosure or response to include information, thereafter acquired if ordered by the court or in the following circumstances: (2) A party is under a duty to seasonably to amend a prior response to an interrogatory, request for production, or request for admission if the party learns that the response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing.

Rather than so notify Defendants, Plaintiff attempts to effectively amend his complaint in his answer to Defendants' motion for summary judgment. Having failed to properly correct his deposition testimony, Plaintiff

---

**22.** A subsequent letter from Mr. Stubl's lawyer reiterated that Plaintiff's claims were limited to the Textron and Magna accounts.

cannot claim that his discovery tactics alerted Defendants to the existence of his pre-termination commissions claims.

Plaintiff cannot create a factual question at the summary judgment stage by submitting an affidavit which contradicts his deposition testimony that he was seeking commissions for the Textron and Magna accounts. Therefore, the Court will not entertain the contradictory affidavit, and Mr. Stubl's claims that he is entitled commissions on the Prince and Britax accounts must fail.

### 3. Post–Termination Orders

█ Mr. Stubl also claims he is entitled to post-termination commissions for orders he procured while still employed at T.A. Defendants deny that Stubl procured the orders in question, and claim that because the express language of the contract does not mention post-termination commissions, Stubl is not entitled to such commissions.[23]

█ The law in Michigan is that sales agents are entitled to post-termination commissions for sales they procured during their time at the former employer.

> In Michigan, as well as in most jurisdictions, the agent is entitled to recover his commission whether or not be [sic] has personally concluded and completed the sale, it being sufficient if his efforts were the procuring cause of the sale. *Reade v. Haak*, 147 Mich. 42, 110 N.W. 130; *Case v. Rudolph Wurlitzer Co.*, 186 Mich. 81, 152 N.W. 977; *MacMillan v. C. & G. Cooper Co.*, 249 Mich. 594, 229 N.W. 593. In Michigan the rule goes further to provide if the authority of the agent has been canceled by the principal, the agent would nevertheless be permitted to recover the commission if the agent was the procuring cause. *Heaton v. Edwards*, 90 Mich. 500, 51 N.W. 544; *McGovern v. Bennett*, 146 Mich. 558, 109 N.W. 1055; *MacMillan v. C. & G. Cooper Co.*, *supra*.

*Reed v. Kurdziel*, 352 Mich. 287, 294–95, 89 N.W.2d 479 (1958). *See also, Shortt v. Centri–Spray Corporation*, 369 Mich. 303, 119 N.W.2d 528 (1963) (*citing Reed*, and holding that the plaintiff was the procuring cause of sales made in early 1960 based on quotations made in 1959). Therefore, as a matter of Michigan law, Stubl is entitled to post-termination commissions if he procured the underlying order.

Defendants claim Stubl was not entitled to a commission (i.e., he did not procure the order) on out-of-state sales unless T.A., in its discretion, agreed to pay a commission, prior to the award of the business. (Frey Deposition, p. 20, 22–24):

> Q. Well, what happens if Ken Frey went to Ohio and got an order from a customer in Ohio and that order came in and you built the machine and it was shipped to Ohio, would you get a commission on that?
> A. In some cases I did get paid because he would make a determination at that time that if there was not a salesman involved or whether he didn't want to follow it, I would get paid on that job.
> Q. Okay. So it would really be Frey would call you in and say I sold this machine down in Ohio, I'm not gonna follow up on it?
> A. That's correct.
> Q. You follow up and do the stuff and I'll pay you a commission?
> A. That's correct.
> Q. So it was oral?
> A. That's correct.
> Q. Okay. And then—
> A. And I followed that job.

(Stubl Deposition, p. 16). T.A. claims they never told Stubl he would receive a commission on either the Textron or Magna accounts, and that Stubl was not with T.A. to "follow the job" such that he would be entitled to a commission.

T.A.'s claim that Stubl did not procure the orders for Textron and Magna is well sub-

**23.** Defendants cite *Dumas v. Auto Club Insurance*, in which the Michigan Supreme Court held: "Unless otherwise provided by contract, renewal commissions or future commissions do not rest upon the sale of the original policy." 437 Mich. 521, 530, 473 N.W.2d 652 (1991). This opinion addressed renewal or future commissions, which are distinguishable from the

standard commissions in this case. Renewal commissions may arise without any effort from the sales person, i.e., the customer decides to renew their policy. The Court ruled in *Dumas* that the right to renewal commissions depended on the contract between the insurance company and the agent, but did not address the issue of initial commissions on first time orders.

stantiated. While T.A. told Stubl to prepare preliminary quotations and sit in several in-house meetings, an outside sales representative made initial contact with both Textron and Magna on the orders at issue. (Defendants' Exhibits I, J, K). The initial request for quotations on the Textron job was sent by Rob Hall, an outside T.A. manufacture's representative on January 24, 1996. This request came after a meeting between Rob Hall and various Textron employees. Stubl was not involved until after the meeting between Hall and Textron, and only at the direction of his superior Ken Frey.

According to T.A., the Magna order also came in as a result of the efforts of an outside T.A. representative. Stubl's sole involvement was to prepare a letter at Frey's direction and attend one meeting with T.A. personnel at Magna. The T.A. quotation upon which the Magna order was issued is dated September 26, 1996, nearly sixty days after Stubl was terminated. He did not follow the order, travel to the customer's out-of-state plants for meetings, or call upon them to inquire about new business. Further, there is no evidence in the record that T.A. agreed to pay Stubl a commission prior to the award of the business.

Plaintiff's only response to Defendants' summary judgment claims is his affidavit statements that once he was put to work on an out-of-state account, he always received the commission on the job. Plaintiff claims he was put to work on the Textron and Magna accounts, and deserves the commissions. This claim is not substantiated by any independent evidence and falls far short of what would be required to establish a triable issue of fact. In fact, Plaintiff has failed to produce any evidence that he procured the accounts. Indeed, all evidence of record is to the contrary. Therefore, Plaintiff has failed to produce evidence sufficient to support this portion of his case, and Defendants' motion for summary judgment on this issue is granted accordingly.

## IV. CONCLUSION

In summary, the Court rules that Mr. Stubl's letter to T.A. provided them with sufficient notice to bring him within the ambit of the Act. Therefore, he is entitled to reimbursement for the amount of the insurance premiums deducted from his paycheck upon his return from leave, supplemented by the appropriate statutory penalties. The Court also rules that individual liability exists under the FMLA. However, no such liability exists here because, despite being covered by the Act, Mr. Stubl has failed to prove discrimination because he presents no evidence that T.A.'s proffered reasons for terminating him were pretextual.

As to Mr. Stubl's commissions claims, the Court holds that a litigant need not exhaust the administrative remedies, under the Michigan Wage and Fringe Benefits Act, for recovering overdue commissions before commencing suit in federal court. Plaintiff's pre-termination claims for commissions on the Prince and Britax accounts, propounded by his late affidavit which contradicted his deposition testimony, does not create a triable issue of fact. Furthermore, Plaintiff's claim for post-termination commissions must fail because Mr. Stubl has failed to present any evidence that he procured the accounts in question.

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment be GRANTED in part and DENIED in part, and that Plaintiff's Motion for Partial Summary Judgment be GRANTED.