James P. SUMMERVILLE, Plaintiff,

v.

ESCO COMPANY LIMITED PARTNERSHIP, Defendant.

No. 1:98–CV–412.

United States District Court, W.D. Michigan, Southern Division.

May 12, 1999.

---

Nelson P. Miller, Fajen & Miller, Grand Haven, for James P. Summerville, pltfs.

Martha W. Atwater, Warner, Norcross & Judd, LLP, Grand Rapids, for ESCO Company Limited Partnership, defts.

## OPINION

QUIST, District Judge.

Plaintiff, James P. Summerville ("Summerville"), has sued Defendant, ESCO Company Limited Partnership ("ESCO"), alleging that ESCO wrongfully discharged him from his employment with ESCO for taking an absence authorized by the Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601 to 2654 ("FMLA"), and wrongfully retaliated against him for taking an absence authorized by FMLA. This matter is before the Court on ESCO's Motion for Summary Judgment.

### Facts

Summerville was hired by ESCO in 1977. Within a few months at ESCO, Summerville began running a kettle and centrifuging chemicals, a position he would keep for almost 20 years. (See Summerville Dep. at 25–27, Pl.'s Br. Ex. A.) ESCO operates its chemical operations plant 24 hours a day and divides its shifts such that each employee works three twelve hour days in a row and then has three days off. (See id. at 32–33.) Summerville was part of a team of eight to ten chemical operators on his shift, although the chemical operators typically work in three person crews (See id. at 47.)

ESCO's unique shift schedule and the small crew size intensified the significance of each employee absence. (See Bosma Dep. at 50–51, 97–98, 103–05, Pl.'s Br. Ex. A.) Summerville agrees that the job was very difficult if someone from the crew was absent and not replaced. (See Summerville Dep. at 47.) ESCO attempted to encourage good attendance through an incentive program that awarded employees who had no tardies or unexcused absences over a quarterly cycle with a "bonus" paid holiday. (See id. at 95–96; see also Ego Dep. at 9–11, Pl.'s Br. Ex. A.) To implement this program, ESCO's payroll department tracks employee absences and notes whether the absence is "pre-arranged," "excused," or "unexcused." (Bosma Dep. at 23–29.)

ESCO did not have a formal attendance policy, other than a general prohibition on excessive absenteeism. (See id. at 50.) ESCO did not define what constituted excessive absenteeism. (See id. at 50; see also Sheffer Dep. at 49–50, 68, Pl's Br. Ex. A.) However, ESCO had a custom of issuing warning letters to employees with at-

tendance problems, warning the employee that continued absences could result in suspension or termination. (*See* Bosma Dep. at 60; *see also* Sheffer Dep. at 20–21.)

Summerville had received at least two warning letters concerning his attendance prior to 1995, but had improved his attendance after receipt of the letters. (*See* Summerville Dep. at 57–58.) Summerville testified that each time he received a warning letter, he "watched [his] attendance real close." (*Id.* at 99.) In January of 1995, Summerville received another warning letter because he had five absences in a two month period. (*See* Memorandum of 1/24/95, Def.'s Br. Supp. Ex. G.) Summerville continued to have some unexcused absences, as payroll records indicate seven unexcused absences between the January 1995 warning letter and the beginning of his heel spur problems in January of 1996. (*See* Attendance Records, Def.'s Br. Supp. Ex. H.)

Summerville began suffering problems with a bone spur in his heel in January of 1996. On January 21, 1996, Summerville left work early to visit a doctor because he "couldn't hardly even walk on" his heel. (*See* Summerville Dep. at 75–77.) Summerville received a cortisone shot from the doctor, and brought in a doctor's slip when he returned to work the following day. (*See id.* at 65; *see also* Medical Report of 2/28/96, Pl.'s Br. Ex. D.) Summerville worked for approximately two weeks without incident, but had unexcused absences February 6, 7, and 8, as a result of the flu. (*See* Summerville Dep. at 67–68.) Summerville then went to his doctor on February 28, a day off, and had a second cortisone injection. (*See* Medical Report of 2/28/96, Pl.'s Br. Ex. D.)

The day after the second cortisone injection, February 29, 1996, Summerville felt a snap in his heel, following which he returned to his doctor, who excused him from work through March 2. (*See* Medical Report of 2/29/96, Pl.'s Br. Ex. D.) Summerville called in to work and said he would not be at work that week, and called again on March 5, 1996, after returning to his doctor and obtaining another doctor's slip to cover March 6–8. (*See* Medical Report of 3/5/96, Pl.'s Br. Ex. D; Summerville Dep. at 84, 88.)

Upon returning to work on March 12, 1996, Summerville presented ESCO with the two doctor's slips. (*See* Bosma Dep. at 56, 100–01.) The same day, ESCO presented Summerville with a warning letter that had been prepared on March 1, 1996, reprimanding Summerville for poor attendance. (*See* Ego Dep. at 12; 3/1/96 Memorandum, Def.'s Br. Supp. Ex. I.)

Summerville alleges that the plant manager and foreman demoted Summerville immediately after his return from FMLA-protected leave from his job running a kettle and centrifuging chemicals down to sweeping the floor and packaging chemicals. Summerville testified that nobody had ever been assigned the job of sweeping the plant floor until this point and that the plant manager and foreman were simply giving him "[e]very shit job they could think of." (Summerville Dep. at 41.) Summerville also stated that his plant manager and foreman told him he was being taken off the centrifuge because of his absences. (*See id.* at 104.)

When pressed for specific examples of how his job duties were curtailed after his return from FMLA-protected leave, Summerville stated that he was asked to sweep the floor each day and dry and package chemicals. (*See id.* at 41–42, 49–50.) Summerville admitted that he had to sweep the floor on occasion prior to taking the FMLA-protected leave, and that he had dried and packaged chemicals before. (*See id.* at 49–50.) However, he said these tasks were not a regular part of his daily responsibilities prior to the FMLA-protected absence. (*See id.*) After returning from his FMLA-protected absence, Summerville also acted as a backup to other employees who were absent or on vacation. (*See id.* at 46.) Eventually, Summerville was moved to a permanent position comparable to his job as a centrifuger after

another employee left in May of 1996. (*See id.* at 50.)

Summerville did not have any additional absences until August 1996. He saw his doctor four more times in August and September 1996, receiving an additional cortisone injection. (*See id.* at 93, 101; Medical Report of 9/6/96, Pl.'s Br. Ex. D.) Summerville had ten unexcused absences between August 1996 and January 1997, although several of these absences related to Summerville contracting the flu, during which time ESCO admits it would not have wanted Summerville to work. (*See* Attendance Report, Def.'s Br. Supp. Ex. H; Sheffer Dep. at 30–31, 33–34.) Summerville was terminated on January 7, 1997.

### Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56. The rule requires that the disputed facts be material. Material facts are facts which are defined by substantive law and are necessary to apply the law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute over trivial facts which are not necessary in order to apply the substantive law does not prevent the granting of a motion for summary judgment. *See id.* at 248, 106 S.Ct. at 2510. The rule also requires the dispute to be genuine. A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *See id.* This standard requires the non-moving party to present more than a scintilla of evidence to defeat the motion. *See id.* at 251, 106 S.Ct. at 2511 (citing *Schuylkill and Dauphin Improvement Co. v. Munson,* 81 U.S. 442, 14 Wall. 442, 448, 20 L.Ed. 867 (1872)). The summary judgment standard mirrors the standard for a directed verdict. *See id.* at 250, 106 S.Ct. at 2511. The only difference between the two is procedural. *See id.* Summary judgment is made based on documentary evidence before trial, and directed verdict is made based on evidence submitted at trial. *See id.*

A moving party who does not have the burden of proof at trial may properly support a motion for summary judgment by showing the court that there is no evidence to support the non-moving party's case. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). If the motion is so supported, the party opposing the motion must then demonstrate with "concrete evidence" that there is a genuine issue of material fact for trial. *Id.; see also Frank v. D'Ambrosi,* 4 F.3d 1378, 1384 (6th Cir. 1993). The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle,* 967 F.2d 233, 236 (6th Cir.1992)(quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

### Analysis

FMLA prohibits employers from discriminating against employees for exercising their rights provided by FMLA. *See* 29 U.S.C. § 2615(a)(1). Regulations promulgated by the Secretary of Labor specifically provide that "employers cannot use the taking of FMLA leave as a negative factor in employment actions ... nor can FMLA leave be counted under 'no fault' attendance policies." 29 C.F.R. § 825.220(c). The Sixth Circuit has not yet addressed how claims of discrimination resulting from the exercise of rights under FMLA are to be analyzed. However, other courts analyzing FMLA discrimination claims have analyzed these claims similarly to those under Title VII of the Civil Rights Act of 1964 or the Americans with Disabilities Act, concluding that:

> There are three methods by which an FMLA plaintiff may establish a prima facie case of FMLA discrimination: by

direct evidence of discriminatory intent; by circumstantial evidence of discriminatory intent through the use of the paradigm postulated in *McDonnell Douglas;* or by establishing a pattern of discrimination through the use of statistical evidence.

*Kaylor v. Fannin Regional Hosp., Inc.,* 946 F.Supp. 988, 1000 (N.D.Ga.1996). Most FMLA discrimination cases have involved an attempt by the plaintiff to present a prima facie case using circumstantial evidence of discriminatory intent through the familiar three-part burden shifting analysis of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See, e.g., King v. Preferred Technical Group,* 166 F.3d 887, 891–92 (7th Cir.1999); *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir.1997).

■ Under *McDonnell Douglas,* the plaintiff has the initial burden of proving a prima facie case by a preponderance of the evidence. *See Ang v. Procter & Gamble Co.,* 932 F.2d 540, 548 (6th Cir.1991). Summerville raises two distinct claims: (1) that ESCO terminated his employment because he took FMLA-protected leave; and (2) that ESCO retaliated against him for taking FMLA-protected leave by reassigning him to a less desirable position. For each of these claims, Summerville must prove the following to make out a prima facie case: (1) he engaged in a protected activity; (2) ESCO took adverse employment action against him; and (3) there is a causal connection between his protected activity and the adverse employment action. *See King,* 166 F.3d at 892; *Morgan,* 108 F.3d at 1325; *Stubl v. T.A. Sys., Inc.,* 984 F.Supp. 1075, 1090 (E.D.Mich.1997).

"If the plaintiff successfully proves a prima facie case, the burden shifts to the employer to 'articulate some legitimate, nondiscriminatory reason for the employee's discharge.'" *Ang,* 932 F.2d at 548 (quoting *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824). "Once the employer carries this burden, the burden shifts back to the plaintiff to prove by a preponderance of the evidence 'that the legitimate reasons offered by the [employer] were not its true reasons, but were merely a pretext for discrimination.'" *Id.* (alteration in original)(quoting *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981)).

## A. Wrongful discharge

### 1. Prima facie case

#### a. Protected activity

FMLA prohibits an employer from terminating an employee because the employee exercised rights provided under FMLA. *See* 29 U.S.C. § 2615(a). ESCO raises two arguments against Summerville's position that his absences between February 29 and March 11 of 1996 were covered by FMLA. First, ESCO argues that the legislative history of the FMLA indicates that Summerville's heel spur should not be considered a "serious health condition" covered by FMLA. Alternatively, ESCO argues that a single follow-up visit after the plaintiff seeks initial treatment for a period of incapacity does not constitute "continuing treatment" under FMLA. (*See* Def.'s Br. at 10.)

ESCO first argues that Summerville's medical problem which caused the absences did not constitute a "serious health condition" within the meaning of FMLA, and is therefore not protected under FMLA. FMLA entitles eligible employees to take up to twelve weeks of unpaid leave "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). FMLA defines "serious health condition" as "an illness, injury impairment, or physical or mental condition that involves [either] (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). The parties agree that Summerville did not receive inpatient care for his heel spur, and therefore Summerville's absence is

governed by FMLA only if it involved "continuing treatment" of his injury by a health care provider.

The term "continuing treatment" is not defined under FMLA. Therefore, ESCO argues that the Court should look at the legislative history of FMLA. ESCO cites *Beal v. Rubbermaid Commercial Products, Inc.,* 972 F.Supp. 1216 (S.D.Iowa 1997), *aff'd,* 149 F.3d 1186 (8th Cir.1998), which looked at the legislative history of FMLA to determine whether the plaintiff's strained back was "the type of injury Congress intended to cover under the FMLA." *Beal,* 972 F.Supp. at 1223. Examples given by the House Committee Report for FMLA of serious health conditions include heart conditions, most cancers, back conditions requiring extensive therapy or surgical procedures, strokes, severe respiratory conditions, and complications or illnesses related to pregnancy. *See* H.R.Rep. No. 103–8, at 29 (1993), *reprinted in* 1993 U.S.C.C.A.N. 3, 31. Summerville's heel spur certainly does not rise to the level of severity of these examples discussed by Congress in the legislative history of FMLA.

■ However, Congress authorized the Secretary of Labor to prescribe regulations governing the interpretation of FMLA. *See* 29 U.S.C. § 2654. This Court must defer to a reasonable interpretation of a statutory provision made by an agency which has been delegated authority to make such interpretations. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). Other Courts that have been faced with interpreting the FMLA have concluded that although the legislative history might arguably offer some insight, the Department of Labor Regulations govern the interpretation of FMLA. *See George v. Associated Stationers,* 932 F.Supp. 1012, 1015 (N.D.Ohio 1996)(mem.op.); *Seidle v. Provident Mut. Life Ins. Co.,* 871 F.Supp. 238, 243 (E.D.Pa.1994). Accordingly, the Court will look to the Department of Labor's regulations in interpreting whether Sum-

merville received "continuing treatment" such that his condition qualified as a "serious medical condition" under FMLA.

■ The phrase "continuing treatment" is defined in regulations promulgated by the Secretary of Labor as "a period of incapacity . . . of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves: 1)[t]reatment two or more times by a health care provider . . .; or 2)[t]reatment by a health care provider on at least one occasion that results in a regimen of continuing treatment under the supervision of the health care provider." 29 C.F.R. § 825.114(2)(i).

ESCO argues that Summerville does not meet this definition of continuing treatment. ESCO argues that Summerville did not receive multiple subsequent treatments for his heel spur, as he visited his physician once on February 29, 1996, and had only one follow-up visit on March 5, 1996. However, the regulation does not require two or more subsequent treatments after the initial treatment. Rather, the regulation by its plain language merely requires two or more treatments, without distinguishing between treatments occurring during or after the initial period of incapacity. "The language of the statute and regulations is clear" that " 'continuing treatment' requires a period of incapacity of more than three consecutive calendar days and two or more examinations or evaluations by a health care provider. The Regulations do not specify a time period during which the minimum two examinations must take place." *George,* 932 F.Supp. at 1015. Summerville's absence from February 29 to March 11 of 1996 meets this definition of "continuing treatment" and therefore is a "serious medical condition" protected under FMLA.

**b. Adverse employment action**

"As recently expressed by the Sixth Circuit, '[t]o constitute an adverse employment action, an act must result in a loss of

pay or benefits, a detrimental change in responsibilities, a negative change in the terms or conditions of employment, or some actual and unfavorable change in job status.'" *Booker v. Budget Rent–A–Car Sys.*, 17 F.Supp.2d 735, 749 (M.D.Tenn.1998)(quoting *Birone v. Indian River Sch.*, 145 F.3d 1329, 1998 WL 199791, at *4 (6th Cir.1998)). There is no question that Summerville's termination on January 7, 1997, is an "adverse employment action." While the reason for his termination is a matter of substantial dispute, the fact that Summerville was fired is sufficient to meet this factor in establishing a prima facie case of discrimination. ESCO's arguments concerning the alleged reason why Summerville was terminated are properly considered at steps two and three of the *McDonnell Douglas* analysis.

### c. Causal connection

Summerville argues that ESCO improperly considered his FMLA-protected absences in its decision to terminate him. However, Summerville was not actually terminated until January of 1997, ten months after taking his FMLA-protected leave. Therefore, his claim that he was terminated because he exercised rights protected by FMLA is more tenuous, as "the Sixth Circuit has stated that it will look to the temporal proximity of the adverse action to the protected activity to determine whether there is a causal connection" and that when the adverse employment action is not in close proximity to the protected activity "other evidence in the record is often required, especially where more than a few days or weeks have passed." *Stubl*, 984 F.Supp. at 1090.

As additional evidence of a causal connection between his FMLA-protected absence and his termination, Summerville points to a letter written by ESCO's personnel director, Dave Johnson, to the Michigan Employment Security Commission ("MESC") on April 30, 1997, three months after Summerville was fired. (*See* Letter from Johnson to Claims Examiner of 4/30/97, Pl.'s Br. Ex. J.) The letter states that Summerville was terminated because of unacceptable attendance. Specifically, the letter references a memorandum from March of 1996 as evidence of Summerville's attendance problems. The memorandum, dated March 1, 1996, indicates that Summerville already had nine absences in 1996. (*See* Memorandum to Summerville of 3/1/96, Pl.'s Br. Ex. H.) Payroll records indicate that Summerville had six absences in 1996 prior to his FMLA-protected leave beginning February 29, 1996. (*See* Attendance Record, Def.'s Br. Supp. Ex. H.) Therefore, three of the absences cited in the memorandum, which ESCO referenced in support of its decision to terminate, may not be considered by ESCO as a reason to terminate Summerville: *See* 29 C.F.R. § 825.220(c)(noting that FMLA-protected leave FMLA may not "be counted under 'no fault' attendance policies").

ESCO argues that Johnson's letter is not probative of whether ESCO considered FMLA-protected absences in deciding to terminate Summerville because: 1) the letter is inadmissible under Michigan statutory law; and 2) the letter dealt with matters outside the personal knowledge of Johnson, who was not the acting personnel director for ESCO at the time Summerville was terminated.

Michigan law prevents a party from using information obtained by the MESC from an employer in a court proceeding "unless the commission is a party to or a complainant in the action or proceeding, or unless used for the prosecution of fraud, civil proceeding, or other legal proceeding pursuant to subdivision (2)." M.C.L. § 421.11(b)(1)(iii). Subdivision (2), added in a 1993 amendment, authorizes the disclosure of information to qualified requesting agencies who are investigating a claim under Aid to Families with Dependent Children, Medicare, or other social welfare programs. *See* M.C.L. § 421.11(b)(2). Contrary to Summerville's argument, the amended statute does not create an exception allowing the use of information obtained by the MESC any time there is a

civil proceeding, but only when a requesting agency is investigating a claim of welfare fraud. "Michigan law also clearly provides that 'any statement made to the MESC in the course of its administrative functions is absolutely privileged and the party making it is immune from suit.'" *Freeman v. Unisys Corp.*, 898 F.Supp. 485, 491 (E.D.Mich.1995)(mem.op.)(quoting *Gonyea v. Motor Parts Fed. Credit Union*, 192 Mich.App. 74, 77, 480 N.W.2d 297, 299 (1991)). Because this letter is not admissible, it may not be considered by this Court in deciding the pending motion. *See* Fed. R.Civ.P. 56(e).

Summerville also argues that Johnson has admitted during his deposition that the six days of leave protected by FMLA were considered in terminating Summerville. However, Johnson clarified that he was not ESCO's personnel director at the time Summerville was terminated and therefore was not involved in the decision to terminate Summerville and cannot explain the basis for the termination. (*See* Johnson Dep. at 2, 52, Pl.'s Br. Ex. A.) Johnson explained that he wrote the letter to the MESC without speaking with the outgoing personnel director, Judy Bosma, prior to writing to the MESC. (*See id.* at 54.) Rather, Johnson merely looked at Summerville's file on his own before responding. (*See id.* at 18.) Johnson explained that he later learned that his assumption that the absences from February 29 to March 11, 1996, were considered in terminating Summerville was incorrect. (*See id.* at 55–57.) Finally, and perhaps most importantly, the letter does not say that Summerville's FMLA-protected leave was considered in the decision to fire him, but simply points to a memo chastising Summerville for his absences, which referenced three absences that qualified as FMLA-protected leave, as an example of Summerville's attendance problems. Accordingly, the Court finds that the letter has very little probative value as to whether there was a causal connection between Summerville's FMLA-protected leave and his termination.

During oral argument, Summerville stressed that his shift supervisor, Donald Sheffer, when asked about the affect of the March 1, 1996, warning letter that Summerville received upon returning from his FMLA-protected absences, admitted that the absences described in the warning letter "contribute[d] to his termination by putting him on a probationary or letter system status[.]" (Sheffer Dep. at 70.) Summerville is correct that three of the absences referenced in the warning letter were protected by FMLA. However, this warning letter was drafted on March 1, 1999, prior to Summerville providing ESCO with a doctor's slip explaining the reason for the absences, and therefore was drafted at a time that ESCO did not know that these three absences were protected by FMLA. Sheffer consistently testified that although these three FMLA-protected absences were referenced in the warning letter, once ESCO learned that these absences were FMLA-protected, the FMLA-protected absences were *not* considered as part of the basis for terminating Summerville. (*See id.* at 25–26, 42, 59–60, 63–65.) For example, when asked by Plaintiff's counsel if the absences related to his heel spur in early March of 1996 were part of the "basis on which he was put on notice not to be absent[,]" Sheffer responded "No. Not the March ones, no." (*Id.* at 42.) Plaintiff's counsel also asked if "it was a factor for you and in Mr. Summerville's firing that he had been off in late February and early March for a continuous period of ... six or seven days" for his foot problem. (*Id.* at 25.) Sheffer responded "No." (*Id.* at 26.) Defense counsel clarified this issue later in the deposition, asking Sheffer whether he counted "the days in March—the February, March days when he was gone for his foot" in "deciding whether to terminate or in recommending the termination" of Summerville. (*Id.* at 60.) Sheffer responded "I did not, no." (*Id.*) Defense counsel asked him again whether he "really count[ed] all nine of the days ... [or] only counted the days that didn't include the foot problem[.]"

(*Id.*) Sheffer again indicated that he only counted the days that didn't include the foot problem. (*See id.*) Accordingly, the only reasonable interpretation of Sheffer's deposition testimony is that, once ESCO learned that three of the absences referenced in the March 1, 1999, warning letter were FMLA-protected, these absences were not considered in deciding to terminate Summerville.

However, even though Summerville has failed to come forward with substantial additional evidence of a causal relationship between his FMLA-protected leave and his discharge, the ten month gap between Summerville's FMLA leave and his termination is still sufficient evidence of a causal connection for the purpose of establishing a prima facie case of FMLA discrimination. The court in *Stubl* determined that, for the sole purpose of deciding a motion for summary judgment, a discharge ten months after an employee's return from FMLA "is sufficient to raise at least an inference of a causal connection for making out a § 2615(a)(2) prima facie case," therefore shifting the burden to the employer to offer a legitimate nondiscriminatory reason for the adverse employment action. *Stubl,* 984 F.Supp. at 1090 (emphasizing that the inference is only sufficient to establish a prima facie case, not sufficient to demonstrate pretext if a legitimate nondiscriminatory reason for the adverse employment action is given by the employer). Accordingly, the Court assumes for the purpose of this Opinion that Summerville has established a prima facie case that he was discriminated against for exercising his rights under FMLA.

## 2. Legitimate nondiscriminatory reason

■ ESCO argues that Summerville was fired for a legitimate nondiscriminatory reason. Specifically, ESCO claims that Summerville "was fired because of his long history of unexcused absences," excluding those absences covered by FMLA. (*See* Def.'s Br. Supp. at 16–17.) In 1996, Summerville was absent 16 times *excluding* his FMLA-protected leave, each of which was "unexcused." (*See* Attendance Record, Def.'s Br. Supp. Ex. H.) ESCO alleges that Summerville was absent from work on an unexcused basis twice as much as any other ESCO employee in 1996. (*See* Def.'s Br. Supp. at 14.) Summerville agreed during his deposition that unexpected absences would significantly affect co-workers. (*See* Summerville Dep. at 47.) All of the ESCO employees involved in the decision to terminate Summerville testified that he was fired because of his long history of unexcused absences and that the six day leave from February 29 to March 11 of 1996 was not considered when making this determination. (*See* Bosma Dep. at 95–97; Ego Dep. at 19–21, 25–26; Sheffer Dep. at 25–26, 42, 59–60, 63–65.)

The Court agrees that regular attendance is a minimum function of almost any job and that excessive absenteeism is a legitimate reason to terminate an employee. *See, e.g., Morgan,* 108 F.3d at 1322, 1324. Accordingly, the Court concludes that ESCO has asserted a legitimate nondiscriminatory reason for Summerville's termination.

## 3. Pretext

■ Summerville argues that ESCO's assertion that Summerville was fired only for non-FMLA protected unexcused absences is pretext and unworthy of belief. However, "[t]he plaintiff cannot withstand summary judgment merely by denying the defendant's articulated legitimate reasons without producing substantiation for the denial." *Stubl,* 984 F.Supp. at 1091 (citing *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 585 (6th Cir.1992)).

Summerville argues that the Johnson letter to the MESC and Johnson's deposition testimony demonstrates that ESCO must have considered the FMLA-protected absences in terminating Summerville and that the statement of ESCO's employees that the FMLA leave was not considered is unworthy of belief. However, for the reasons previously indicated, the Johnson letter is inadmissible. Furthermore,

Johnson explained that his previous belief that ESCO considered Summerville's FMLA-protected leave in terminating him was an erroneous assumption that Johnson made without proper investigation. Accordingly, Johnson's letter and testimony does not demonstrate that ESCO's legitimate nondiscriminatory reason for firing Summerville was pretextual.

Summerville also argues that Sheffer's admission that the absences described in the March 1, 1996, warning letter "contribut[ed] to his termination by putting him on a probationary or letter system status" demonstrates that the reason given by ESCO for terminating Summerville is pretextual. (Sheffer Dep. at 70.) However, as explained previously, Sheffer testified at several other points during the deposition that although the FMLA-protected absences were referenced in the warning letter, they were *not* considered in deciding to terminate Summerville. (*See id.* at 25–26, 42, 59–60, 63–65.) Furthermore, plant manager Max Ego and Human Resources director Judy Bosma have also unequivocally testified that the FMLA-protected absences were not considered in the determination to terminate Summerville. (*See* Bosma Dep. at 95–97; Ego Dep. at 19–21, 25–26.). Accordingly, the testimony of Sheffer does not demonstrate that the legitimate nondiscriminatory reason for terminating Summerville offered by ESCO is pretextual.

■ Finally, Summerville argues that other employees who had more absences than him were not terminated or otherwise disciplined. A plaintiff may also demonstrate pretext by showing that similarly situated employees were treated differently. *See Morgan,* 108 F.3d at 1324. Other employees are similarly situated if they "dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir.1992).

Summerville argues that other ESCO employees had many more absences than him without being terminated. For example, Summerville notes that in 1994 chemical operator Tom Herring had 91 total work absences. (*See* Attendance Records, Pl.'s Br. Ex. K.) However, the record indicates that almost all of these absences were the result of medical leave for foot surgery, workers compensation days, or authorized vacation days, and that Herring had only three unexcused absences during that period. (*See id.*) Randy Hayes is cited as another example of an employee with more total absences than Summerville. However, not a single one of Hayes' absences was unexcused. (*See id.*). The same came an be said of David DeVowe, who had more absences than Summerville but no unexcused absences. (*See id.*) The final person cited by Summerville, Kelly Berg, had the same number of total absences as Summerville but only six unexcused absences over a three year period. (*See id.*)

In contrast, Summerville had 16 unexcused absences that were not protected under FMLA in 1996 alone. (*See* Attendance Record, Def.'s Br. Supp. Ex. H.) Summerville also had 10 unexcused absences in 1995 and 8 unexcused absences in 1994. (*See id.*) Summerville has not demonstrated that any other ESCO employees had remotely similar attendance histories but were not terminated. Summerville's number of unexcused absences distinguishes him from the other employees to whom Summerville attempts to compare himself.

The Court holds that Summerville has failed to demonstrate that the legitimate nondiscriminatory reason given by ESCO for terminating Summerville, namely his large number of unexcused absences, is pretextual. Accordingly, summary judgment on Summerville's claim that he was wrongfully terminated in violation of FMLA will be granted in favor of ESCO.

## B. Retaliation claim

### 1. Prima facie case

#### a. Protected activity

As discussed previously, the Court has concluded as a matter of law that the absences at issue, from February 29 to March 11 of 1996, were covered by FMLA. Accordingly, Summerville has demonstrated that he was engaged in a protected activity for purposes of his retaliation claim.

#### b. Adverse employment action

Summerville argues that he suffered an adverse employment, as he was demoted by the plant manager and foreman from his job running a kettle and centrifuging chemicals down to sweeping the floor and packaging chemicals immediately after his return from FMLA-protected leave. Summerville testified that nobody had ever been assigned the job of sweeping the plant floor until this point and that the plant manager and foreman were simply giving him "[e]very shit job they could think of." (Summerville Dep. at 41.) Summerville also stated that his plant manager and foreman told him he was being taken off the centrifuge because of his absences. (*See id.* at 104.)

When pressed for specific examples of how his job duties were curtailed after his return from FMLA-protected leave, Summerville stated that he was asked to sweep the floor each day and dry and package chemicals. (*See id.* at 41–42, 49–50.) Summerville admitted that he had to sweep the floor on occasion prior to taking the FMLA-protected leave, and that he had dried and packaged chemicals before. (*See id.* at 49–50.) However, these tasks were not a regular part of his daily responsibilities prior to the FMLA-protected absence. (*See id.*) After returning from his FMLA-protected absence, Summerville also acted as a backup to other employees who were absent or on vacation. (*See id.* at 46.) Eventually, Summerville was moved to a permanent position comparable to his job as a centrifuger after another employee left in May of 1996. (*See id.* at 50.)

■ The Court concludes that Summerville has demonstrated that he suffered an adverse employment action upon returning to ESCO after his FMLA-protected leave. Summerville was taken off his normal job of centrifuging and kettles. Although he had swept the floor and dried and packaged chemicals before, these tasks were not a regular part of his normal job duties and constituted "'a detrimental change in responsibilities ... or some actual and unfavorable change in job status,'" therefore establishing that he suffered an adverse employment action immediately upon returning to work. *Booker,* 17 F.Supp.2d at 749 (quoting *Birone,* 145 F.3d 1329, 1998 WL 199791, at *4.)

#### c. Causal connection

The final element of a prima facie case of retaliation is that "there is a causal connection between the employee's protected activity and the employer's adverse employment action." *King,* 166 F.3d at 892. "To demonstrate the 'causal link,' the employee must demonstrate that the employer would not have taken the adverse employment action but for the employee's protected activity." *Id.*

■ Summerville has come forward with evidence that his demotion in job responsibility was directly related to his taking FMLA-protected leave. Summerville testified at his deposition that he was taken off the centrifuge and kettles and demoted to a job sweeping the plant floor. (*See* Summerville Dep. at 40–41.) Summerville also stated that his plant manager and foreman told him he was being taken off the centrifuge because of his absences. (*See id.* at 104.) Summerville was taken off the centrifuge and asked to sweep immediately after he returned from FMLA-protected leave. (*See id.* at 43.) This evidence is sufficient to prove a causal connection for purposes of establishing a prima facie case of retaliation.

### 2. Legitimate nondiscriminatory reason

ESCO argues that it had a legitimate nondiscriminatory reason to alter Summerville's job duties. At the time of the FMLA-protected leave in March of 1996, ESCO was in the middle of an expansion and was making preparations to open a new plant. (*See* Ego Dep. at 14; Ego Aff. ¶ 2, Def.'s Reply Br. Ex. Q.) As part of this expansion, ESCO removed three of its four centrifuge operators, including Summerville, from their positions in order to train new employees.[1] (*See* Ego Aff. ¶ 3.) The other centrifuge operators were reassigned to running the RX 101–103 kettles, which "are absolutely critical to ESCO's operations and require[ ] constant and uninterrupted attention." (*Id.* ¶¶ 5–6.) However, Ego decided to reassign Summerville to drying and packaging, rather than running the RX 101–103 kettles, because "his attendance was unpredictable." (*Id.* ¶ 7.) Furthermore, unlike running the RX 101–103 kettles, drying and packaging "could be performed by another shift in the event Mr. Summerville missed work" and allowed Summerville "to stop and rest [his foot] whenever necessary." (*Id.* ¶¶ 8–9.)

FMLA regulations authorize an employer to temporarily transfer an employee who needs intermittent leave "to an available alternative position for which the employee is qualified and which better accommodates recurring periods of leave than does the employee's regular position." 29 C.F.R. § 825.204(a). "The alternate position must have equivalent pay and benefits ... [but] does not have to have equivalent duties." 29 C.F.R. § 825.204(c). Ego told Summerville that if he was going to miss any more work because of his foot that he should undergo surgery. (*See* Summerville Dep. at 93.) Summerville told Ego that he was not going to have surgery on his foot, as his doctor told him the heel spur should go away on its own. (*See id.* at 93.)

The Court finds that ESCO had a legitimate nondiscriminatory reason for removing Summerville from his centrifuge position, as three of the four centrifuge operators were moved for legitimate business purposes as a result of ESCO's preparations to open a new plant. The Court also finds that, because of Summerville's attendance problems prior to his FMLA-protected leave and Summerville's indication that he was not going to have surgery for his heel spur, it was a reasonable business decision for Summerville not to be assigned to running the RX 101–103 kettles. The temporary assignment of Summerville to drying and packing better accommodated the substantial possibility that Summerville would require leave for his bone spur again, as drying and packing was not a crucial job requiring strict attendance and allowed Summerville to rest his foot when needed. Summerville did not suffer a loss of pay or benefits during this reassignment and in fact had previously done drying and packing. (*See id.* at 49–50.) Finally, the reassignment lasted only two months, at which time Summerville was moved to a permanent position comparable to his job as a centrifuger after another employee left in May of 1996. (*See id.* at 50.) Accordingly, ESCO has offered a legitimate nondiscriminatory reason for the change in Summerville's duties.

### 3. Pretext

Summerville argues that ESCO's assertion that Summerville's job duties changed for legitimate business purposes is pretext and unworthy of belief. However, as noted previously, "[t]he plaintiff cannot withstand summary judgment merely by denying the defendant's articulated legitimate reasons without producing substantiation for the denial." *Stubl,* 984 F.Supp. at 1091 (citing *Mitchell,* 964 F.2d at 585). Summerville has offered no evidence, other than his own assertions, that he was reassigned to drying and packaging because he took FMLA-protected leave. The fact

---

1. The fourth centrifuge operator was reassigned in 1997. (*See* Ego Aff. ¶ 3.)

that Ego and Sheffer told him he would be drying and packaging rather than operating kettles because of his problem with absences is entirely consistent with the legitimate nondiscriminatory reason Summerville was moved. Because Summerville has failed to come forward with any substantial evidence that the legitimate nondiscriminatory reason Summerville's job duties were temporarily changed is pretextual, summary judgment will also be entered in favor of Defendant on the retaliation claim.

### Conclusion

For the foregoing reasons, summary judgment will be entered in favor of Defendant.

An Order consistent with this Opinion will be entered.

### ORDER

For the reasons stated in the Opinion entered on this date,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (docket no. 26) is **GRANTED.** The clerk is directed to enter judgment in favor of the Defendant.

This case is terminated.